In the course of this trial it appeared by the evidence that the prisoner, though not indicted for a second offence, had been convicted of larceny in this court and sold as a servant to pay the restitution money and costs. Before the expiration of his term of service he committed larceny again, and was convicted thereof by the verdict of a jury at this term. The Indictment was drawn in both cases charging the prisoner generally as a free mulatto.
After verdict, W. II. Rogers, who prosecuted for the state, moved for judgment against the prisoner; but the court remanded him for the present, that they might look into the question, whether he was to be considered a free mulatto for the purposes of this prosecution.
We permitted the verdict to be taken without calling the attention of the jury to a supposed difficulty arising out of the description of the prisoner as a free mulatto, intending to give him the full benefit of the objection, in case upon reflection, his conviction under these circumstances should appear to us to be improper.
The fifth section of the act of the 8th February, 1826, "providing for the punishment of certain crimes and misdemeanors," (Digest,
144,) enacts in general terms, that if any person shall be disposed of as a servant as a part of his or her punishment, according to this act, the purchaser shall during the servitude, be entitled to all the labor, service and earning of such servant, and shall have all the power and authority of a master or mistress over such servant, andduring the term, for which such person shall be so ordered to hedisposed of as a servant, such person shall not be considered ordeemed to be a freeman in this state. The question is, shall the prisoner who was convicted of larceny and sold under the provisions of that act for the payment of the restitution money and costs be considered, during his servitude, as a free mulatto within the legal meaning of his description in this indictment?
It is true, that the section of the act to which we have referred is general in its terms, and seems to embrace in all its provisions, the cases of convict free negroes as well as convict whites. But every statute must be construed with reference to all its parts; those which are in pari materia must be considered together; and this act, embodying as it does, a very large portion of our criminal code which, before the revision of that code, was scattered through many different enactments, will perhaps often require the application of the rule.
The fifth section of this act, so far as it directs that the convict, during his servitude, shall not be considered as a freeman,
points at those only who by the constitution and laws of this state, were before that act regarded as freemen. The constitution of 1792, which *Page 536 
was in operation at the time of the passage of this act, describes the qualification of a voter by this phrase, (Art. 4,) and in 1826, no one but a "white freeman" was entitled to the exercise of the elective franchise. The object of the peculiar clause in the act of 1826, now to be considered, was so far to disfranchise a felon convict or person disposed of as a servant, as a part of his punishment according to that act, as to deprive him of the right of suffrage, and of holding places of honor, trust or profit during servitude, by degrading him below the rank of a freeman. The next section of the act adds still more severe disqualifications as the legal consequences of conviction. The disfranchising clause in the fifth section had no operation upon free negroes or free mulattoes, who never were entitled to the right of suffrage, or the right of holding public office in Delaware, and therefore, never were regarded as freemen — a term used among us as peculiarly applicable to those who were entitled to the political rights of citizenship. The constitution of 1831, describes the qualified voter as a "free white male citizen," and following up the principle adopted for the first time in the act of 1826, it ordains that "no person convicted of a crime deemed by the law felony, shall enjoy the right of an elector; and as doubts had been expressed (however ill founded,) in regard to the constitutionality of the disqualifying clause in the act of 1826, it expressly provides "that the legislature may impose the forfeiture of the right of suffrage, as a punishment for crime." These provisions in the amended constitution, could with as much propriety be supposed to have been intended for free negroes or free mulattoes, as the disfranchising clause in the act of 1826; for they were never considered as entitled to the political rights of freemen or citizens in Delaware. The peculiar freedom which they have enjoyed was restricted by the act of the 3d February, 1787, which has generally been referred to as the charter of their rights in this state, and which while it speaks of the freedom of the negroes embraced by its provisions, expressly declares that they shall "not enjoy any rights of a freeman, other than to hold property and obtain redress in law or equity from any injury to person or property." The privileges of voting at elections, and of being elected or appointed to any office of trust or profit" are denied to them by that statute, and the distinction between a "free negro" and a "freeman" in this state, became too plain to admit of cavil after its enactment, however the authors of its benevolent provisions may have subjected themselves to the criticisms of such as hold the negro entitled to every right of man civil and political.
If with this preliminary view of the meaning of terms which were well understood by the authors of the act of 1826, we turn our attention *Page 537 
to other parte of that act; there is no difficulty in reconciling them as consistent with each other. The previous clause, (Digest,
134-5,) which prescribes the punishment for larceny by a free negro or free mulatto, it) immediately followed by a provision that "every free negro or free mulatto, so offending a second or other subsequent time, upon conviction of such second or other subsequent offence, shall forfeit and pay to the owner or owners like restitution money as aforesaid, and shall be disposed of as a servant to the highest and best bidder or bidders, for the period of seven years." If cases like that of the prisoner be not within the purview of this provision, they are not punishable by any law of this state; for the last section of the act of the 7th of February, 1827, "concerning certain crimes and offences committed by slaves," c. expressly declares, that "a person disposed of as a servant pursuant to any judgment, sentence, or order of any court, shall not be deemed to be a slave within any provision of that act." If, then, the legislature by enacting that a felon convict, during his servitude, shall not be deemed to be a freeman, can be supposed to have declared that such a convict, if a free negro, shall not be deemed to be a free negro during his servitude, they have exempted such negro convicts from all punishment during the term of servitude for every second or subsequent offence. For being thus held to be neither free negroes nor slaves, they would be quite out of the pale of the criminal jurisdiction of any judicial tribunal in the state.
Nor does this construction of the act violate any legal right of the master of the prisoner. It is true that the fifth section confers upon him, during the term of servitude, all the labor, service, and earnings of the servant, and all the power and authority of a master over such servant. But like every other master his right to service is subject to a paramount claim of the law, which subjects all men to punishment for crime without respect, in general, for the mere demands of private right. The master of an apprentice hanged for murder has no legal claim against the state, because its laws have claimed the forfeit for a capital crime; for he holds his servant subject to the prior claims of public justice against that servant. A special statute has given the master of a slave, upon whom the punishment of death may be inflicted for a capital crime, two-thirds of the assessed value of the slave, (Digest, 149,) to be paid by the county where the crime is committed. But this very exception only substantiates the general principle; and where is the provision for any remuneration to the master of the prisoner, were he now to be capitally punished for crime? The hardship on the master would be *Page 538 
in such a supposable case, greater than any which can grow out of the present circumstances of the prisoner; for now the master may, if he prefer to retain his servant, keep him in servitude to him during the residue of his term by paying the restitution money and costs, arising under the last conviction. On the other hand, if the prisoner were not punishable under this conviction, the rights of the owner of the property stolen, as well as the much more important demands of avenging justice, would be defeated.
In this case, as the indictment does not in terms describe the felony as a second offence, we shall not order the prisoner, under the circumstances, to be sold to any person residing out of the state.